**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DARLENE JESPERSEN,
          *Plaintiff-Appellant,*

          v.

HARRAH'S OPERATING COMPANY,
INC.,

          *Defendant-Appellee.*

No. 03-15045

D.C. No.
CV-01-00401-ECR

OPINION

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, District Judge, Presiding

Argued and Submitted
June 22, 2005—San Francisco, California

Filed April 14, 2006

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
Alex Kozinski, Pamela Ann Rymer, Barry G. Silverman,
Susan P. Graber, William A. Fletcher, Richard C. Tallman,
Richard R. Clifton, Consuelo M. Callahan, and
Carlos T. Bea, Circuit Judges.

Opinion by Chief Judge Schroeder;
Dissent by Judge Pregerson;
Dissent by Judge Kozinski

4115

**COUNSEL**

Jennifer C. Pizer, LAMBDA Legal Defense and Education Fund, Inc., Los Angeles, California, for the plaintiff-appellant.

Kenneth J. McKenna, Kenneth James McKenna, Inc., Reno, Nevada, for the plaintiff-appellant.

Patrick H. Hicks, Littler Mendelson, P.C., Las Vegas, Nevada, for the defendant-appellee.

## OPINION

SCHROEDER, Chief Judge:

We took this sex discrimination case en banc in order to reaffirm our circuit law concerning appearance and grooming standards, and to clarify our evolving law of sex stereotyping claims.

The plaintiff, Darlene Jespersen, was terminated from her position as a bartender at the sports bar in Harrah's Reno casino not long after Harrah's began to enforce its comprehensive uniform, appearance and grooming standards for all bartenders. The standards required all bartenders, men and women, to wear the same uniform of black pants and white shirts, a bow tie, and comfortable black shoes. The standards also included grooming requirements that differed to some extent for men and women, requiring women to wear some facial makeup and not permitting men to wear any. Jespersen refused to comply with the makeup requirement and was effectively terminated for that reason.

The district court granted summary judgment to Harrah's on the ground that the appearance and grooming policies imposed equal burdens on both men and women bartenders because, while women were required to use makeup and men were forbidden to wear makeup, women were allowed to have long hair and men were required to have their hair cut to a length above the collar. *Jespersen v. Harrah's Operating Co.*, 280 F. Supp. 2d 1189, 1192-93 (D. Nev. 2002). The district

court also held that the policy could not run afoul of Title VII because it did not discriminate against Jespersen on the basis of the "immutable characteristics" of her sex. *Id.* at 1192. The district court further observed that the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality opinion), prohibiting discrimination on the basis of sex stereotyping, did not apply to this case because in the district court's view, the Ninth Circuit had excluded grooming standards from the reach of *Price Waterhouse. Jespersen*, 280 F. Supp. 2d at 1193. In reaching that conclusion, the district court relied on *Nichols v. Azteca Restaurant Enters., Inc.*, 256 F.3d 864, 875 n.7 (9th Cir. 2001) ("We do not imply that all gender-based distinctions are actionable under Title VII. For example, our decision does not imply that there is any violation of Title VII occasioned by reasonable regulations that require male and female employees to conform to different dress and grooming standards."). *Jespersen*, 280 F. Supp. 2d at 1193. The district court granted summary judgment to Harrah's on all claims.

The three-judge panel affirmed, but on somewhat different grounds. *Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076 (9th Cir. 2004). The panel majority held that Jespersen, on this record, failed to show that the appearance policy imposed a greater burden on women than on men. *Id.* at 1081-82. It pointed to the lack of any affidavit in this record to support a claim that the burdens of the policy fell unequally on men and women. Accordingly, the panel did not agree with the district court that grooming policies could never discriminate as a matter of law. On the basis of *Nichols* and *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061 (9th Cir. 2002) (en banc), the panel also held that *Price Waterhouse* could apply to grooming or appearance standards only if the policy amounted to sexual harassment, which would require a showing that the employee suffered harassment for failure to conform to commonly-accepted gender stereotypes. *Id.* at 1082-83. The dissent would have denied summary judgment on both theories. *Id.* at 1083-88.

We agree with the district court and the panel majority that on this record, Jespersen has failed to present evidence sufficient to survive summary judgment on her claim that the policy imposes an unequal burden on women. With respect to sex stereotyping, we hold that appearance standards, including makeup requirements, may well be the subject of a Title VII claim for sexual stereotyping, but that on this record Jespersen has failed to create any triable issue of fact that the challenged policy was part of a policy motivated by sex stereotyping. We therefore affirm.

## I.   BACKGROUND

Plaintiff Darlene Jespersen worked successfully as a bartender at Harrah's for twenty years and compiled what by all accounts was an exemplary record. During Jespersen's entire tenure with Harrah's, the company maintained a policy encouraging female beverage servers to wear makeup. The parties agree, however, that the policy was not enforced until 2000. In February 2000, Harrah's implemented a "Beverage Department Image Transformation" program at twenty Harrah's locations, including its casino in Reno. Part of the program consisted of new grooming and appearance standards, called the "Personal Best" program. The program contained certain appearance standards that applied equally to both sexes, including a standard uniform of black pants, white shirt, black vest, and black bow tie. Jespersen has never objected to any of these policies. The program also contained some sex-differentiated appearance requirements as to hair, nails, and makeup.

In April 2000, Harrah's amended that policy to require that women wear makeup. Jespersen's only objection here is to the makeup requirement. The amended policy provided in relevant part:

All Beverage Service Personnel, in addition to being friendly, polite, courteous and responsive to our cus-

tomer's needs, must possess the ability to physically perform the essential factors of the job as set forth in the standard job descriptions. They must be well groomed, appealing to the eye, be firm and body toned, and be comfortable with maintaining this look while wearing the specified uniform. Additional factors to be considered include, but are not limited to, hair styles, overall body contour, and degree of comfort the employee projects while wearing the uniform.

* * *

Beverage Bartenders and Barbacks will adhere to these additional guidelines:

- Overall Guidelines (applied equally to male/ female):

    - Appearance: Must maintain Personal Best image portrayed at time of hire.

    - Jewelry, if issued, must be worn. Otherwise, tasteful and simple jewelry is permitted; no large chokers, chains or bracelets.

    - No faddish hairstyles or unnatural colors are permitted.

- Males:

    - Hair must not extend below top of shirt collar. Ponytails are prohibited.

    - Hands and fingernails must be clean and nails neatly trimmed at all times. No colored polish is permitted.

- Eye and facial makeup is not permitted.

- Shoes will be solid black leather or leather type with rubber (non skid) soles.

- Females:

  - Hair must be teased, curled, or styled every day you work. Hair must be worn down at all times, no exceptions.

  - Stockings are to be of nude or natural color consistent with employee's skin tone. No runs.

  - Nail polish can be clear, white, pink or red color only. No exotic nail art or length.

  - Shoes will be solid black leather or leather type with rubber (non skid) soles.

  - *Make up (face powder, blush and mascara) must be worn and applied neatly in complimentary colors. Lip color must be worn at all times.*
    *(emphasis added).*

Jespersen did not wear makeup on or off the job, and in her deposition stated that wearing it would conflict with her self-image. It is not disputed that she found the makeup requirement offensive, and felt so uncomfortable wearing makeup that she found it interfered with her ability to perform as a bartender. Unwilling to wear the makeup, and not qualifying for any open positions at the casino with a similar compensation scale, Jespersen left her employment with Harrah's.

After exhausting her administrative remedies with the Equal Employment Opportunity Commission and obtaining a right to sue notification, Jespersen filed this action in July 2001. In her complaint, Jespersen sought damages as well as declaratory and injunctive relief for discrimination and retaliation for opposition to discrimination, alleging that the "Personal Best" policy discriminated against women by "(1) subjecting them to terms and conditions of employment to which men are not similarly subjected, and (2) requiring that women conform to sex-based stereotypes as a term and condition of employment."

Harrah's moved for summary judgment, supporting its motion with documents giving the history and purpose of the appearance and grooming policies. Harrah's argued that the policy created similar standards for both men and women, and that where the standards differentiated on the basis of sex, as with the face and hair standards, any burdens imposed fell equally on both male and female bartenders.

In her deposition testimony, attached as a response to the motion for summary judgment, Jespersen described the personal indignity she felt as a result of attempting to comply with the makeup policy. Jespersen testified that when she wore the makeup she "felt very degraded and very demeaned." In addition, Jespersen testified that "it prohibited [her] from doing [her] job" because "[i]t affected [her] self-dignity . . . [and] took away [her] credibility as an individual and as a person." Jespersen made no cross-motion for summary judgment, taking the position that the case should go to the jury. Her response to Harrah's motion for summary judgment relied solely on her own deposition testimony regarding her subjective reaction to the makeup policy, and on favorable customer feedback and employer evaluation forms regarding her work.

The record therefore does not contain any affidavit or other evidence to establish that complying with the "Personal Best"

standards caused burdens to fall unequally on men or women, and there is no evidence to suggest Harrah's motivation was to stereotype the women bartenders. Jespersen relied solely on evidence that she had been a good bartender, and that she had personal objections to complying with the policy, in order to support her argument that Harrah's " 'sells' and exploits its women employees." Jespersen contended that as a matter of law she had made a prima facie showing of gender discrimination, sufficient to survive summary judgment on both of her claims.

The district court granted Harrah's motion for summary judgment on all of Jespersen's claims. *Jespersen*, 280 F. Supp. 2d at 1195-96. In this appeal, Jespersen maintains that the record before the district court was sufficient to create triable issues of material fact as to her unlawful discrimination claims of unequal burdens and sex stereotyping. We deal with each in turn.

## II.   UNEQUAL BURDENS

**[1]** In order to assert a valid Title VII claim for sex discrimination, a plaintiff must make out a prima facie case establishing that the challenged employment action was either intentionally discriminatory or that it had a discriminatory effect on the basis of gender. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Harriss v. Pan Am. World Airways, Inc.*, 649 F.2d 670, 673 (9th Cir. 1980). Once a plaintiff establishes such a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell*, 411 U.S. at 802.

**[2]** In this case, Jespersen argues that the makeup requirement itself establishes a prima facie case of discriminatory intent and must be justified by Harrah's as a bona fide occupational qualification. *See* 42 U.S.C. § 2000e-2(e)(1).[1] Our

---

[1]"[I]t shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of his religion, sex, or national

settled law in this circuit, however, does not support Jespersen's position that a sex-based difference in appearance standards alone, without any further showing of disparate effects, creates a prima facie case.

In *Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602 (9th Cir. 1982), we considered the Continental Airlines policy that imposed strict weight restrictions on female flight attendants, and held it constituted a violation of Title VII. We did so because the airline imposed no weight restriction whatsoever on a class of male employees who performed the same or similar functions as the flight attendants. *Id.* at 610. Indeed, the policy was touted by the airline as intended to "create the public image of an airline which offered passengers service by thin, attractive women, whom executives referred to as Continental's 'girls.' " *Id.* at 604. In fact, Continental specifically argued that its policy was justified by its "desire to compete [with other airlines] by featuring attractive female cabin attendants[,]" a justification which this court recognized as "discriminatory on its face." *Id.* at 609. The weight restriction was part of an overall program to create a sexual image for the airline. *Id.* at 604.

**[3]** In contrast, this case involves an appearance policy that applied to both male and female bartenders, and was aimed at creating a professional and very similar look for all of them. All bartenders wore the same uniform. The policy only differentiated as to grooming standards.

In *Frank v. United Airlines, Inc.*, 216 F.3d 845 (9th Cir. 2000), we dealt with a weight policy that applied different standards to men and women in a facially unequal way. The women were forced to meet the requirements of a medium

origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise[.]"

body frame standard while men were required to meet only the more generous requirements of a large body frame standard. *Id.* at 854. In that case, we recognized that "[a]n appearance standard that imposes different but essentially equal burdens on men and women is not disparate treatment." *Id.* The United weight policy, however, did not impose equal burdens. On its face, the policy embodied a requirement that categorically " 'applie[d] less favorably to one gender[,]' " and the burdens imposed upon that gender were obvious from the policy itself. *Id.* (quoting *Gerdom*, 692 F.2d at 608 (alteration omitted)).

**[4]** This case stands in marked contrast, for here we deal with requirements that, on their face, are not more onerous for one gender than the other. Rather, Harrah's "Personal Best" policy contains sex-differentiated requirements regarding each employee's hair, hands, and face. While those individual requirements differ according to gender, none on its face places a greater burden on one gender than the other. Grooming standards that appropriately differentiate between the genders are not facially discriminatory.

**[5]** We have long recognized that companies may differentiate between men and women in appearance and grooming policies, and so have other circuits. *See, e.g.*, *Fountain v. Safeway Stores, Inc.*, 555 F.2d 753, 755 (9th Cir. 1977); *Barker v. Taft Broad. Co.*, 549 F.2d 400, 401 (6th Cir. 1977); *Earwood v. Cont'l Southeastern Lines, Inc.*, 539 F.2d 1349, 1350 (4th Cir. 1976); *Longo v. Carlisle DeCoppet & Co.*, 537 F.2d 685, 685 (2d Cir. 1976) (per curiam); *Knott v. Mo. Pac. R.R. Co.*, 527 F.2d 1249, 1252 (8th Cir. 1975); *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084, 1092 (5th Cir. 1975) (en banc); *Baker v. Cal. Land Title Co.*, 507 F.2d 895, 896 (9th Cir. 1974); *Dodge v. Giant Food, Inc.*, 488 F.2d 1333, 1337 (D.C. Cir. 1973). The material issue under our settled law is not whether the policies are different, but whether the policy imposed on the plaintiff creates an "unequal burden" for the plaintiff's gender. *See Frank*, 216 F.3d at 854-55; *Ger-*

*dom*, 692 F.2d at 605-06; *see also Fountain*, 555 F.2d at 755-56.

**[6]** Not every differentiation between the sexes in a grooming and appearance policy creates a "significantly greater burden of compliance[.]" *Gerdom*, 692 F.2d at 606. For example, in *Fountain*, this court upheld Safeway's enforcement of its sex-differentiated appearance standard, including its requirement that male employees wear ties, because the company's actions in enforcing the regulations were not "overly burdensome to its employees[.]" 555 F.2d at 756; *see also Baker*, 507 F.2d at 898. Similarly, as the Eighth Circuit has recognized, "[w]here, as here, such [grooming and appearance] policies are reasonable and are imposed in an evenhanded manner on all employees, slight differences in the appearance requirements for males and females have only a negligible effect on employment opportunities." *Knott*, 527 F.2d at 1252. Under established equal burdens analysis, when an employer's grooming and appearance policy does not unreasonably burden one gender more than the other, that policy will not violate Title VII.

Jespersen asks us to take judicial notice of the fact that it costs more money and takes more time for a woman to comply with the makeup requirement than it takes for a man to comply with the requirement that he keep his hair short, but these are not matters appropriate for judicial notice. Judicial notice is reserved for matters "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. The time and cost of makeup and haircuts is in neither category. The facts that Jespersen would have this court judicially notice are not subject to the requisite "high degree of indisputability" generally required for such judicial notice. Fed. R. Evid. 201 advisory committee's note.

Our rules thus provide that a plaintiff may not cure her failure to present the trial court with facts sufficient to establish

the validity of her claim by requesting that this court take judicial notice of such facts. *See id.*; *see also* Fed. R. Civ. Proc. 56(e). Those rules apply here. Jespersen did not submit any documentation or any evidence of the relative cost and time required to comply with the grooming requirements by men and women. As a result, we would have to speculate about those issues in order to then guess whether the policy creates unequal burdens for women. This would not be appropriate. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."); *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) ("A party opposing a summary judgment motion must produce *specific* facts showing that there remains a genuine factual issue for trial and evidence significantly probative as to any material fact claimed to be disputed.") (internal quotation marks and alteration omitted); *cf. Lindahl v. Air France*, 930 F.2d 1434, 1437 (9th Cir. 1991) (In a Title VII case, "a plaintiff cannot defeat summary judgment simply by making out a prima facie case.").

**[7]** Having failed to create a record establishing that the "Personal Best" policies are more burdensome for women than for men, Jespersen did not present any triable issue of fact. The district court correctly granted summary judgment on the record before it with respect to Jespersen's claim that the makeup policy created an unequal burden for women.

## III.   SEX STEREOTYPING

In *Price Waterhouse*, the Supreme Court considered a mixed-motive discrimination case. 490 U.S. 228 (1989). There, the plaintiff, Ann Hopkins, was denied partnership in the national accounting firm of Price Waterhouse because some of the partners found her to be too aggressive. *Id.* at 234-36. While some partners praised Hopkins's " 'strong character, independence and integrity[,]' " others commented that she needed to take " 'a course at charm school[.]' " *Id.* at

234-35. The Supreme Court determined that once a plaintiff has established that gender played "a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account." *Id.* at 258.

**[8]** Consequently, in establishing that "gender played a motivating part in an employment decision," a plaintiff in a Title VII case may introduce evidence that the employment decision was made in part because of a sex stereotype. *Id.* at 250-51. According to the Court, this is because "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for 'in forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.' " *Id.* at 251 (quoting *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978) (alteration omitted)). It was therefore impermissible for Hopkins's employer to place her in an untenable Catch-22: she needed to be aggressive and masculine to excel at her job, but was denied partnership for doing so because of her employer's gender stereotype. Instead, Hopkins was advised to " 'walk more femininely, talk more femininely, dress more femininely, wear make up, have her hair styled, and wear jewelry.' " *Id.* at 235.

The stereotyping in *Price Waterhouse* interfered with Hopkins' ability to perform her work; the advice that she should take "a course at charm school" was intended to discourage her use of the forceful and aggressive techniques that made her successful in the first place. *Id.* at 251. Impermissible sex stereotyping was clear because the very traits that she was asked to hide were the same traits considered praiseworthy in men.

**[9]** Harrah's "Personal Best" policy is very different. The policy does not single out Jespersen. It applies to all of the bartenders, male and female. It requires all of the bartenders to wear exactly the same uniforms while interacting with the public in the context of the entertainment industry. It is for the most part unisex, from the black tie to the non-skid shoes. There is no evidence in this record to indicate that the policy was adopted to make women bartenders conform to a commonly-accepted stereotypical image of what women should wear. The record contains nothing to suggest the grooming standards would objectively inhibit a woman's ability to do the job. The only evidence in the record to support the stereotyping claim is Jespersen's own subjective reaction to the makeup requirement.

Judge Pregerson's dissent improperly divides the grooming policy into separate categories of hair, hands, and face, and then focuses exclusively on the makeup requirement to conclude that the policy constitutes sex stereotyping. *See* Judge Pregerson Dissent at 4139. This parsing, however, conflicts with established grooming standards analysis. *See*, *e.g.*, *Knott v. Mo. Pac. R. Co.*, 527 F.2d at 1252 ("Defendant's hair length requirement for male employees is *part of a comprehensive personal grooming code* applicable to all employees.") (emphasis added). The requirements must be viewed in the context of the overall policy. The dissent's conclusion that the unequal burdens analysis allows impermissible sex stereotyping to persist if imposed equally on both sexes, *see* Judge Pregerson Dissent at 4138-39, is wrong because it ignores the protections of *Price Waterhouse* our decision preserves. If a grooming standard imposed on either sex amounts to impermissible stereotyping, something this record does not establish, a plaintiff of either sex may challenge that requirement under *Price Waterhouse*.

**[10]** We respect Jespersen's resolve to be true to herself and to the image that she wishes to project to the world. We cannot agree, however, that her objection to the makeup

requirement, without more, can give rise to a claim of sex stereotyping under Title VII. If we were to do so, we would come perilously close to holding that every grooming, apparel, or appearance requirement that an individual finds personally offensive, or in conflict with his or her own self-image, can create a triable issue of sex discrimination.

This is not a case where the dress or appearance requirement is intended to be sexually provocative, and tending to stereotype women as sex objects. *See*, *e.g.*, *EEOC v. Sage Realty Corp.*, 507 F. Supp. 599 (S.D.N.Y. 1981). In *Sage Realty*, the plaintiff was a lobby attendant in a hotel that employed only female lobby attendants and required a mandatory uniform. The uniform was an octagon designed with an opening for the attendant's head, to be worn as a poncho, with snaps at the wrists and a tack on each side of the poncho, which was otherwise open. *Id.* at 604. The attendants wore blue dancer pants as part of the uniform but were prohibited from wearing a shirt, blouse, or skirt under the outfit. *Id.* There, the plaintiff was required to wear a uniform that was "short and revealing on both sides [such that her] thighs and portions of her buttocks were exposed." *Id.* Jespersen, in contrast, was asked only to wear a unisex uniform that covered her entire body and was designed for men and women. The "Personal Best" policy does not, on its face, indicate any discriminatory or sexually stereotypical intent on the part of Harrah's.

Nor is this a case of sexual harassment. *See Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1068-69 (9th Cir. 2002) (en banc); *Nichols v. Azteca Restaurant Enters., Inc.*, 256 F.3d 864, 874 (9th Cir. 2001). Following *Price Waterhouse*, our court has held that sexual harassment of an employee because of that employee's failure to conform to commonly-accepted gender stereotypes is sex discrimination in violation of Title VII. In *Nichols*, a male waiter was systematically abused for failing to act "as a man should act," for walking and carrying his tray "like a woman," and was derided for not having sex-

ual intercourse with a female waitress who was his friend. *Nichols*, 256 F.3d at 874. Applying *Price Waterhouse*, our court concluded that this harassment was actionable discrimination because of the plaintiff's sex. *Id.* at 874-75. In *Rene*, the homosexual plaintiff stated a Title VII sex stereotyping claim because he endured assaults "of a sexual nature" when Rene's co-workers forced him to look at homosexual pornography, gave him sexually-oriented "joke" gifts and harassed him for behavior that did not conform to commonly-accepted male stereotypes. *Rene*, 305 F.3d at 1064-65. *Nichols* and *Rene* are not grooming standards cases, but provide the framework for this court's analysis of when sex stereotyping rises to the level of sex discrimination for Title VII purposes. Unlike the situation in both *Rene* and *Nichols*, Harrah's actions have not condoned or subjected Jespersen to any form of alleged harassment. It is not alleged that the "Personal Best" policy created a hostile work environment.

Nor is there evidence in this record that Harrah's treated Jespersen any differently than it treated any other bartender, male or female, who did not comply with the written grooming standards applicable to all bartenders. Jespersen's claim here materially differs from Hopkins' claim in *Price Waterhouse* because Harrah's grooming standards do not require Jespersen to conform to a stereotypical image that would objectively impede her ability to perform her job requirements as a bartender.

**[11]** We emphasize that we do not preclude, as a matter of law, a claim of sex-stereotyping on the basis of dress or appearance codes. Others may well be filed, and any bases for such claims refined as law in this area evolves. This record, however, is devoid of any basis for permitting this particular claim to go forward, as it is limited to the subjective reaction of a single employee, and there is no evidence of a stereotypical motivation on the part of the employer. This case is essentially a challenge to one small part of what is an overall apparel, appearance, and grooming policy that applies largely

the same requirements to both men and women. As we said in *Nichols*, in commenting on grooming standards, the touchstone is reasonableness. A makeup requirement must be seen in the context of the overall standards imposed on employees in a given workplace.

AFFIRMED.

---

PREGERSON, Circuit Judge, with whom Judges KOZINSKI, GRABER, and W. FLETCHER join, dissenting:

I agree with the majority that appearance standards and grooming policies may be subject to Title VII claims. I also agree with the majority that a Title VII plaintiff challenging appearance standards or grooming policies may "make out a prima facie case [by] establishing that the challenged employment action was *either* intentionally discriminatory *or* that it had a discriminatory effect on the basis of gender." Maj. Op. at 4125 (emphasis added). In other words, I agree with the majority that a Title VII plaintiff may make out a prima facie case by showing that the challenged policy either was motivated in part "because of a sex stereotype," Maj. Op. at 4130, or "creates an 'unequal burden' for the plaintiff's gender," Maj. Op. at 4127. Finally, I agree with the majority that Jespersen failed to introduce sufficient evidence to establish that Harrah's "Personal Best" program created an undue burden on Harrah's female bartenders.[1] I part ways with the majority, however, inasmuch as I believe that the "Personal Best" pro-

---

[1] I have little doubt that Jespersen could have made some kind of a record in order to establish that the "Personal Best" policies are more burdensome for women than for men. The cost of makeup and time needed to apply it can both be quantified as can, for example, the cost of haircuts and time needed for nail trimming; had a record been offered in this case to establish the alleged undue burden on women, the district court could have evaluated it. Having failed to create such a record, Jespersen did not present any triable issue of fact on this issue.

gram was part of a policy motivated by sex stereotyping and that Jespersen's termination for failing to comply with the program's requirements was "because of" her sex. Accordingly, I dissent from Part III of the majority opinion and from the judgment of the court.

The majority contends that it is bound to reject Jespersen's sex stereotyping claim because she presented too little evidence — only her "own subjective reaction to the makeup requirement." Maj. Op. at 4131. I disagree. Jespersen's evidence showed that Harrah's fired her because she did not comply with a grooming policy that imposed a facial uniform (full makeup) on only female bartenders. Harrah's stringent "Personal Best" policy required female beverage servers to wear foundation, blush, mascara, and lip color, and to ensure that lip color was on at all times. Jespersen and her female colleagues were required to meet with professional image consultants who in turn created a facial template for each woman. Jespersen was required not simply to wear makeup; in addition, the consultants dictated where and how the makeup had to be applied.

Quite simply, her termination for failing to comply with a grooming policy that imposed a facial uniform on only female bartenders is discrimination "because of" sex. Such discrimination is clearly and unambiguously impermissible under Title VII, which requires that "gender must be *irrelevant* to employment decisions." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989) (plurality opinion) (emphasis added).[2]

---

[2]Title VII identifies only one circumstance in which employers may take gender into account in making an employment decision — namely, "when gender is a 'bona fide occupational qualification [(BFOQ)] reasonably necessary to the normal operation of th[e] particular business or enterprise.' " *Price Waterhouse*, 490 U.S. at 242 (alterations in original) (quoting 42 U.S.C. § 2000e-2(e)); *see also Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977) (recognizing that the BFOQ was meant to be an extremely narrow exception to the general prohibition of discrimination on

Notwithstanding Jespersen's failure to present additional evidence, little is required to make out a sex-stereotyping — as distinct from an undue burden — claim in this situation. In *Price Waterhouse*, the Supreme Court held that an employer may not condition employment on an employee's conformance to a sex stereotype associated with their gender. *Id.* at 250-51. As the majority recognizes, *Price Waterhouse* allows a Title VII plaintiff to "introduce evidence that the employment decision was made in part because of a sex stereotype." Maj. Op. at 4130; *see also Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring) (requiring that a plaintiff show "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision"). It is not entirely clear exactly what this evidence must be, but nothing in *Price Waterhouse* suggests that a certain type or quantity of evidence is required to prove a prima facie case of discrimination. *Cf. Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98-102 (2003) (holding that a plaintiff may prove discrimination in a Title VII case using either direct or circumstantial evidence and that, to obtain a mixed-motive instruction, the plaintiff need only present evidence sufficient for a reasonable jury to conclude, by a preponderance of the evidence, that sex was a motivating factor for an employment practice).

Moreover, *Price Waterhouse* recognizes that gender discrimination may manifest itself in stereotypical notions as to how women should dress and present themselves, not only as to how they should behave. *See* 490 U.S. at 235 (noting that

_____

the basis of sex). Harrah's has not attempted to defend the "Personal Best" makeup requirement as a BFOQ. In fact, there is little doubt that the "Personal Best" policy is not a business necessity, as Harrah's quietly disposed of this policy after Jespersen filed this suit. Regardless, although a BFOQ is a defense that an employer may raise, *see Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 515 (9th Cir. 2000), it does not preclude the employee from demonstrating the elements of a prima facie case of discrimination and presenting her case to a jury.

the plaintiff was told that her consideration for partnership would be enhanced if, among other things, she "dress[ed] more femininely, [wore] make-up, [had] her hair styled, and [wore] jewelry"); *see also Dawson v. Bumble & Bumble*, 398 F.3d 211, 221 (2d Cir. 2005) (recognizing that one can fail to conform to gender stereotypes either through behavior *or* through appearance); *Smith v. City of Salem*, 378 F.3d 566, 574 (6th Cir. 2004) ("After *Price Waterhouse*, an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is engaging in sex discrimination because the discrimination would not occur but for the victim's sex."); *Doe v. City of Belleville*, 119 F.3d 563, 582 (7th Cir. 1997) (rejecting the defendant's argument that *Price Waterhouse* does not apply to personal appearance standards), *vacated and remanded on other grounds*, 523 U.S. 1001 (1998).

Hopkins, the *Price Waterhouse* plaintiff, offered individualized evidence, describing events in which she was subjected to discriminatory remarks. However, the Court did not state that such evidence was required. To the contrary, the Court noted that

> By focusing on Hopkins' specific proof . . . we do not suggest a limitation on the possible ways of proving that stereotyping played a motivating role in an employment decision, and we refrain from deciding here which specific facts, 'standing alone,' would or would not establish a plaintiff's case, since such a decision is unnecessary in this case.

*Price Waterhouse*, 490 U.S. at 251-52; *see also id.* at 271 (O'Connor, J., concurring) (recognizing that "direct evidence of intentional discrimination is hard to come by"). The fact that Harrah's required female bartenders to conform to a sex stereotype by wearing full makeup while working is not in dispute, and the policy is described at length in the majority opinion. *See* Maj. Op. at 4122-23. This policy did not, as the

majority suggests, impose a "grooming, apparel, or appearance requirement that an individual finds personally offensive," Maj. Op. at 4132, but rather one that treated Jespersen differently from male bartenders "because of" her sex. I believe that the fact that Harrah's designed and promoted a policy that required women to conform to a sex stereotype by wearing full makeup is sufficient "direct evidence" of discrimination.

The majority contends that Harrah's "Personal Best" appearance policy is very different from the policy at issue in *Price Waterhouse* in that it applies to both men and women. *See* Maj. Op. at 4131 ("[The Personal Best policy] applies to all of the bartenders, male and female. It requires all of the bartenders to wear exactly the same uniforms while interacting with the public in the context of the entertainment industry.") I disagree. As the majority concedes, "Harrah's 'Personal Best' policy contains sex-differentiated requirements regarding each employee's hair, hands, and face." Maj. Op. at 4127. The fact that a policy contains sex-differentiated requirements that affect people of both genders cannot excuse a particular requirement from scrutiny. By refusing to consider the makeup requirement separately, and instead stressing that the policy contained some gender-neutral requirements, such as color of clothing, as well as a variety of gender-differentiated requirements for "hair, hands, and face," the majority's approach would permit otherwise impermissible gender stereotypes to be neutralized by the presence of a stereotype or burden that affects people of the opposite gender, or by some separate non-discriminatory requirement that applies to both men and women. By this logic, it might well have been permissible in *Frank v. United Airlines, Inc.*, 216 F.3d 845 (9th Cir. 2000), to require women, but not men, to meet a medium body frame standard *if* that requirement were imposed as part of a "physical appearance" policy that also required men, but not women, to achieve a certain degree of upper body muscle definition. But the fact that employees of both genders are subjected to gender-specific requirements

does not necessarily mean that particular requirements are not motivated by gender stereotyping.

Because I believe that we should be careful not to insulate appearance requirements by viewing them in broad categories, such as "hair, hands, and face," I would consider the makeup requirement on its own terms. Viewed in isolation — or, at the very least, as part of a narrower category of requirements affecting employees' faces — the makeup or facial uniform requirement becomes closely analogous to the uniform policy held to constitute impermissible sex stereotyping in *Carroll v. Talman Federal Savings & Loan Ass'n of Chicago*, 604 F.2d 1028, 1029 (7th Cir. 1979). In *Carroll*, the defendant bank required women to wear employer-issued uniforms, but permitted men to wear business attire of their own choosing. The Seventh Circuit found this rule discriminatory because it suggested to the public that the uniformed women held a "lesser professional status" and that women could not be trusted to choose appropriate business attire. *Id.* at 1032-33.

Just as the bank in *Carroll* deemed female employees incapable of achieving a professional appearance without assigned uniforms, Harrah's regarded women as unable to achieve a neat, attractive, and professional appearance without the facial uniform designed by a consultant and required by Harrah's. The inescapable message is that women's undoctored faces compare unfavorably to men's, not because of a physical difference between men's and women's faces, but because of a cultural assumption — and gender-based stereotype — that women's faces are incomplete, unattractive, or unprofessional without full makeup. We need not denounce all makeup as inherently offensive, just as there was no need to denounce all uniforms as inherently offensive in *Carroll*, to conclude that *requiring* female bartenders to wear full makeup is an impermissible sex stereotype and is evidence of discrimination because of sex. Therefore, I strongly disagree with the majority's conclusion that there "is no evidence in this record to

indicate that the policy was adopted to make women bartenders conform to a commonly-accepted stereotypical image of what women should wear." Maj. Op. at 4131.

I believe that Jespersen articulated a classic case of *Price Waterhouse* discrimination and presented undisputed, material facts sufficient to avoid summary judgment. Accordingly, Jespersen should be allowed to present her case to a jury.

Therefore, I respectfully dissent.

---

KOZINSKI, Circuit Judge, with whom Judges GRABER and W. FLETCHER join, dissenting:

I agree with Judge Pregerson and join his dissent—subject to one caveat: I believe that Jespersen also presented a triable issue of fact on the question of disparate burden.

The majority is right that "[t]he [makeup] requirements must be viewed in the context of the overall policy." Maj. at 4131; *see also id.* at 4133-34. But I find it perfectly clear that Harrah's overall grooming policy is substantially more burdensome for women than for men. Every requirement that forces men to spend time or money on their appearance has a corresponding requirement that is as, or more, burdensome for women: short hair v. "teased, curled, or styled" hair; clean trimmed nails v. nail length and color requirements; black leather shoes v. black leather shoes. *See id.* at 4122-23. The requirement that women spend time and money applying full facial makeup has no corresponding requirement for men, making the "overall policy" more burdensome for the former than for the latter. The only question is how much.

It is true that Jespersen failed to present evidence about what it costs to buy makeup and how long it takes to apply it. But is there any doubt that putting on makeup costs money

and takes time? Harrah's policy requires women to apply face powder, blush, mascara and lipstick. You don't need an expert witness to figure out that such items don't grow on trees.

Nor is there any rational doubt that application of makeup is an intricate and painstaking process that requires considerable time and care. Even those of us who don't wear makeup know how long it can take from the hundreds of hours we've spent over the years frantically tapping our toes and pointing to our wrists. It's hard to imagine that a woman could "put on her face," as they say, in the time it would take a man to shave —certainly not if she were to do the careful and thorough job Harrah's expects. Makeup, moreover, must be applied and removed every day; the policy burdens men with no such daily ritual. While a man could jog to the casino, slip into his uniform, and get right to work, a woman must travel to work so as to avoid smearing her makeup, or arrive early to put on her makeup there.

It might have been tidier if Jespersen had introduced evidence as to the time and cost associated with complying with the makeup requirement, but I can understand her failure to do so, as these hardly seem like questions reasonably subject to dispute. We could—and should—take judicial notice of these incontrovertible facts.

Alternatively, Jespersen did introduce evidence that she finds it burdensome to *wear* makeup because doing so is inconsistent with her self-image and interferes with her job performance. *See* maj. at 4124. My colleagues dismiss this evidence, apparently on the ground that wearing makeup does not, as a matter of law, constitute a substantial burden. This presupposes that Jespersen is unreasonable or idiosyncratic in her discomfort. Why so? Whether to wear cosmetics— literally, the face one presents to the world—is an intensely personal choice. Makeup, moreover, touches delicate parts of the anatomy—the lips, the eyes, the cheeks—and can cause serious discomfort, sometimes even allergic reactions, for

someone unaccustomed to wearing it. If you are used to wearing makeup—as most American women are—this may seem like no big deal. But those of us not used to wearing makeup would find a requirement that we do so highly intrusive. Imagine, for example, a rule that all judges wear face powder, blush, mascara and lipstick while on the bench. Like Jespersen, I would find such a regime burdensome and demeaning; it would interfere with my job performance. I suspect many of my colleagues would feel the same way.

Everyone accepts this as a reasonable reaction from a man, but why should it be different for a woman? It is not because of anatomical differences, such as a requirement that women wear bathing suits that cover their breasts. Women's faces, just like those of men, can be perfectly presentable without makeup; it is a cultural artifact that most women raised in the United States learn to put on—and presumably enjoy wearing—cosmetics. But cultural norms change; not so long ago a man wearing an earring was a gypsy, a pirate or an oddity. Today, a man wearing body piercing jewelry is hardly noticed. So, too, a large (and perhaps growing) number of women choose to present themselves to the world without makeup. I see no justification for forcing them to conform to Harrah's quaint notion of what a "real woman" looks like.

Nor do I think it appropriate for a court to dismiss a woman's testimony that she finds wearing makeup degrading and intrusive, as Jespersen clearly does. Not only do we have her sworn statement to that effect, but there can be no doubt about her sincerity or the intensity of her feelings: She quit her job—a job she performed well for two decades—rather than put on the makeup. That is a choice her male colleagues were not forced to make. To me, this states a case of disparate burden, and I would let a jury decide whether an employer can force a woman to make this choice.

Finally, I note with dismay the employer's decision to let go a valued, experienced employee who had gained accolades

from her customers, over what, in the end, is a trivial matter. Quality employees are difficult to find in any industry and I would think an employer would long hesitate before forcing a loyal, long-time employee to quit over an honest and heart-felt difference of opinion about a matter of personal significance to her. Having won the legal battle, I hope that Harrah's will now do the generous and decent thing by offering Jespersen her job back, and letting her give it her personal best—without the makeup.